**STATE of Maine**

**v.**

**Charles T. BESSEY.**

Supreme Judicial Court of Maine.

Nov. 20, 1974.

Vernon I. Arey, Asst. Atty. Gen., Augusta, for plaintiff.

Caroline Glassman, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

Indictments were brought against the Defendant in 1970 charging him with two felonious homicides punishable as murder. He pleaded not guilty and was tried on the indictment charging him with the death of Mildred Eddy. The jury found him guilty of assault with intent to kill.

The Court then granted the State's motion to reduce the charge in the other indictment (which charged the Defendant with the death of Russell M. Choate) to assault with intent to kill and Defendant entered a plea of nolo contendere to that indictment. M.R.Crim.P., Rule 11.

The Defendant was sentenced to serve a term of not less than 4½ and not more than 10 years for the assault upon Mildred Eddy and was committed. After he had served six months of this sentence, he filed a petition for the statutory writ of post-conviction habeas corpus in which he contended for the first time that the Superior Court had lacked jurisdiction to sen-

tence him because the offense of assault with intent to kill is not an offense necessarily included within a charge of felonious homicide in the penalty degree of murder.

On November 22, 1972, this Court agreed with that contention and held that the indictment charging Defendant with felonious homicide in the penalty degree of murder was not legally sufficient to form a basis for his conviction of the crime of assault with intent to kill Mildred Eddy. His conviction was set aside and the Defendant was ordered enlarged forthwith. Bessey v. State, Me., 297 A.2d 373 (1972). At that time he had been incarcerated approximately 22 months.

On May 9, 1973, the State indicted the Defendant for the offense of assault with intent to kill Mildred Eddy, the offense for which he had erroneously been convicted in January, 1971.[1] The Defendant responded to this indictment with a plea of not guilty and a motion for dismissal (M.R.Crim.P., Rule 12(b)(2)), basing his argument for dismissal on three grounds. Defendant argues first that, because he has already been convicted once for the offense of assault with intent to kill Mildred Eddy (on the indictment charging felonious homicide punishable as murder), another trial now for assault with intent to kill will place him in double jeopardy and is, therefore, barred both by the Fifth Amendment of the Constitution of the United States and Article I, § 8 of the Constitution of Maine. Secondly, Defend-

ant urges that prosecution under the present indictment will deny him fundamental fairness and due process of law in violation of the Fourteenth Amendment of the Constitution of the United States and Article I, § 6–A of the Constitution of Maine. Finally, it is Defendant's contention that institution of the present action denies him the right to a speedy trial guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, § 6 of the Constitution of Maine.

A Justice of the Superior Court denied Defendant's motion to dismiss and the matter was ordered reported to this Court for decision on the Defendant's claimed entitlement to dismissal. M.R.Crim.P., Rule 37A(b).[2]

The Defendant's first two claims can be reduced to the proposition that having convinced this Court that his 1971 conviction of assault with intent to kill had no legal validity, he may now raise that conviction as a bar to further prosecution for that offense.

*The Defendant's Claim of Double Jeopardy*

We find no support for the Defendant's first proposition, using either federal Fifth Amendment double jeopardy standards (which the states must now meet under the pronouncement of Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), or those of our own constitution.

The United States Supreme Court accepted unequivocally in United States v.

---

**1.** We recognized in Bessey v. State, supra, that the jury verdict in the previous trial finding the Petitioner, now the Defendant, guilty of assault with intent to kill was an implied acquittal of the charge of felonious homicide.

**2.** Although the Justice's report is phrased in the language of M.R.Crim.P., Rule 37A (a) which provides for Report by Agreement of Important or Doubtful Questions, the Justice had already denied the Defendant's motion to dismiss and the report is in fact an appeal by the Defendant from

the Justice's interlocutory ruling which is authorized by Rule 37A(b).

"(b) Appeal of Interlocutory Rulings. If the court is of the opinion that a question of law involved in an interlocutory order or ruling made by it in any action ought to be determined by the Law Court before any further proceedings are taken therein, it may . . . report the case to the Law Court for that purpose . . . ." M.R.Crim.P., Rule 37A(b).

We treat the matter as an appeal of an interlocutory ruling.

Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) the principle that a defendant who by writ of error succeeds in having his conviction set aside may be tried again for the offense for which he had been convicted. This principle has since been reasserted in numerous cases as the Court noted in United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964) which described the *Ball* rule as a well established part of our constitutional jurisprudence, citing Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919) (reversed after conviction for confession of error); Bryan v. United States, 338 U. S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950) (reversed after conviction because of insufficient evidence); Forman v. United States, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed. 2d 412 (1960) (reversed after conviction for error in instructions to the jury).

In *Tateo* Justice Harlan articulated the basic philosophy behind the rule:

"While different theories have been advanced to support the permissibility of retrial, of greater importance then the conceptual abstractions employed to explain the Ball principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's in-

terest." 377 U.S. at 466, 84 S.Ct. at 1589, 12 L.Ed.2d at 451.

Later, in United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) the Court held that a sua sponte declaration of mistrial by a presiding Justice *was* a bar to reprosecution. Justice Harlan, in a plurality opinion, distinguished this situation from one in which a conviction is reversed on appeal, saying:

"The determination to allow reprosecution in these circumstances [where a defendant wins a reversal on appeal of a conviction] reflects the judgment that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decision making resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error. But it is also clear that recognition that the defendant can be reprosecuted for the same offense after successful appeal does not compel the conclusion that double jeopardy policies are confined to prevention of prosecutorial or judicial overreaching. For the crucial difference between reprosecution after appeal by the defendant and reprosecution after a sua sponte judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.'" 400 U.S. at 484, 91 S.Ct. at 556, 27 L. Ed.2d at 556.

■ Although, as Justice Harlan noted in *Tateo*, different theories have been advanced to justify the *Ball* rule, it is abundantly clear to us that the federal constitutional prohibition against double jeopardy does not extend to retrial for the offense

for which a defendant has been convicted when that conviction has been reversed for error at the defendant's instigation.[3]

Our own Court has held to a similar position with equal consistency. In State v. White, Me., 285 A.2d 832, 834 (1972) we declared that the principle that "retrial after a successful appeal does not constitute double jeopardy is by now 'Hornbook' law."

In State v. Fletcher, Me., 288 A.2d 92 (1972) we cited the *White* decision and observed that

"[i]t is elementary that a Defendant's appeal does not deprive the State of jurisdiction to try him again if, on appeal, his conviction is set aside . . . and to impose (within the limitations of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)) a new sentence if a Defendant's new trial results in a new conviction." 288 A.2d at 94–95.

■ Our present case is very nearly a classic example of one which demands the application of the *Ball* rule of right to retrial.[4] Only the error of the Justice in submitting the issue of assault with intent to kill to the jury required reversal. The

defendant was not deprived of right to go to the jury on the charge of felonious homicide (as was the defendant in United States v. Jorn, supra) and, in fact, gained an implied acquittal on that charge as a result of the erroneous verdict.[5]

*The Same Transaction Test*

■ The Defendant, however, urges us that fundamental fairness in prosecution and the due process clause should impel us to abandon our traditional concept of double jeopardy and adopt in its place the more liberal "same transaction" test. The rationale of this standard is that the state should not be permitted to put a defendant to successive trials for the same or different charges of criminal conduct arising out of the same transaction but should, if prosecution of several offenses committed in the same occurrence is desirable, join the charges for a single trial. This Defendant says he was entitled to be tried—at one trial—for any and all violations of law for which the State chose to charge him growing out of the "transaction" which the State claimed resulted in the death of Mildred Eddy.

We are not convinced that our traditional concept of right to retrial should be abandoned. In fact, we consider it even

3. For a helpful discussion of the waiver theory and the one continuing jeopardy theory, see Mayers and Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960).

4. We realize that it can also be argued with logic that the Defendant has never been placed in jeopardy on the charge of assault with intent to kill as, under our law, jeopardy begins only when a defendant "is put upon trial before a court of competent jurisdiction, *upon an indictment sufficient in form and substance to sustain a conviction*." (Emphasis added.) State v. Slorah, 118 Me. 203, 208, 106 A. 768, 770 (1919) ; State v. Boynton, 143 Me. 313, 62 A.2d 182 (1948). As the indictment upon which the defendant was tried was insufficient to charge assault with intent to kill, the Court was without jurisdiction to try the accused, to find guilt or to impose sentence as to that offense. State v. Scott, Me., 317 A.2d 3 (1974) ; State v. Nelson Freightways, Inc., Me., 309 A.2d 125 (1973) ; State v. Eldon, 41 Me. 165 (1856). *See* Illinois v. Somer-

ville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed. 2d 425 (1973).

Nevertheless, the indictment *did* sufficiently charge felonious homicide and the defendant *was* put in jeopardy on that charge and the jury verdict of guilty of a supposed lesser included offense was an implied acquittal of the offense charged. We prefer to ground our holdings upon the rationale that although the Defendant's trial for felonious homicide resulted in an erroneous judgment of guilty of assault with intent to kill and required a reversal, the *Ball* rule applies. *Tateo* settles that the rule of *Ball* extends to the situation of a collateral attack. *See also* Mullreed v. Kropp, 425 F.2d 1095 (6th Cir. 1970).

5. Of course, in the event Defendant is convicted and sentenced to confinement on the pending charge he will be credited with the time already served on his previous erroneous conviction. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

more appropriately the position of this Court since our decision in State v. Leeman, Me., 291 A.2d 709 (1972) in which we adopted a policy strictly limiting the lesser offenses which are included in the greater offense—the very policy decision which the Defendant relied upon to obtain the setting aside of his first conviction. In *Leeman* we quoted the language of Professor Orfield, Criminal Procedure under the Federal Rules, Vol. 5, § 31:12, and approved of his definition as describing the majority and our own rule:

> "To be necessarily included in the greater offense, the lesser offense must be such that it is impossible to commit the greater without having committed the lesser." 291 A.2d at 711.

■ Having determined that a Defendant may not be convicted of a lesser offense not included by legal definition in the offense charged in the indictment, thus narrowing the area in which a defendant is in jeopardy, we are now unconvinced as to the wisdom of adopting the single transaction test which would in effect widen the area in which he is secure from further prosecution.

A number of states have sought to avoid the danger of unfair repeated prosecution by adopting the "same transaction" test, some in the context of double jeopardy and others under the more generalized principles of due process. The phrase has been used in different contexts and with different connotations, greatly reducing the precedential value of many of the cases, but the three cases which we will discuss appear to be fairly illustrative of typical "same transaction" fact situations. The purpose of the rule is well described by the Michigan Court of Appeals in People v. White, 41 Mich.App. 370, 200 N.W.2d 326 (1972). The Court said:

> "There are several purposes underlying the double jeopardy prohibition. First, guilt should be established by proving criminal elements to a single

jury rather than by allowing a prosecutor to rely on the increased probability of conviction by repeated prosecution. Thus, the rule against reprosecution for the same offense after acquittal. Second, the prosecutor should not be able to go sentence shopping by bringing successive prosecutions for the same offense before different judges. Thus, prosecution after conviction is prohibited. Third, criminal trials should not be instruments of harassment and second trials are forbidden. Finally, a person should not be subject to multiple punishment for a single legislatively defined offense. Judges, therefore, may not impose multiple punishment for the same offense at a single trial." 41 Mich.App. at 375, 200 N.W.2d at 328.

White had been convicted of the crime of kidnapping. Although that conviction was neither appealed nor vacated, he was then tried and convicted of the offenses of rape and felonious assault upon the same female the same evening. The Court found that:

> "In the instant case, defendant committed three identifiable crimes in one continuous sequence to achieve one purpose—sexual intercourse with his victim. The same witnesses and essentially the same evidence was heard at both trials. A review of that evidence indicates that the assault was necessary to achieve the kidnapping and the kidnapping was merely preparatory in achieving the ultimate goal—rape." 41 Mich.App. at 380, 200 N.W.2d at 331.

The opinion did not question the State's right to be vindicated for each crime committed during the single transaction. Although the Court speaks of jeopardy, the thrust of its holding seems to be the avoidance of the unfairness which might result from successive trials and successive punishments for conduct which the Court believed was a single, indivisible transaction.

The Supreme Court of Hawaii applied the "same transaction" test in an appeal by

a defendant whose conviction for possession of an unregistered firearm (a misdemeanor for which he received a sentence of 15 days) was followed by a trial and conviction in another court for possession of a firearm by a felon (a felony, for which he was sentenced to 15 years imprisonment). State v. Ahuna, 52 Haw. 321, 474 P.2d 704 (1970). The Hawaii Court noted that in the past it had applied both the "same evidence" test (which a majority of jurisdictions follow) [6] and the "same transaction" test, each in appropriate circumstances, and the Court doubted that "the answer to the problem of identity of offenses in the context of the double jeopardy principle lies in the selection of any single test as providing the applicable formula." Deciding that the evil sought to be prevented under each statute involved was the possession of an unregistered firearm —a conclusion which may seem to be not entirely free from doubt—the Court held that the second prosecution placed the defendant in jeopardy a second time for the same act.

The defendant in Commonwealth v. Campana, 452 Pa. 233, 304 A.2d 432 (1973) had been tried before a Justice of the Peace on a charge of disorderly conduct and was found not guilty. Additional charges of assault on a police officer and resisting arrest, arising from the same incident, were dismissed for lack of sufficient evidence. Later, the same charges of assault on a police officer and resisting arrest were brought before *another* Justice of the Peace who bound the defendant over to the grand jury. He was indicted and convicted.

The Pennsylvania Supreme Court felt that the proliferation of criminal statutes now affords the state such a variety of possible prosecutions for a single criminal act that the "same evidence" test of double jeopardy has become ineffective. The Court also believed the collateral estoppel principle announced in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), infra, to be an unsatisfactory protective tool, since its applicability requires that the first trial must have ended in an acquittal and a rational reading of the record must disclose that the jury must have based its verdict of acquittal on a particular issue. The Pennsylvania Court then endorsed and applied the same transaction test and set aside the convictions.

In Ashe v. Swenson, supra, the United States Supreme Court considered the appropriateness of a claim of double jeopardy to the situation of multiple prosecutions for one robbery of multiple victims. The defendant, after being tried and found not guilty of robbery of one of the several participants in a poker game, was tried for robbery of a second victim. This time, although the witnesses were, for the most part, the same, their testimony as to identification of the defendant as the robber was substantially stronger than before and the defendant was convicted. The majority of the Court was satisfied from the record that the single rationally conceivable issue in dispute before the first jury was that of identification of the defendant as one of the robbers. This issue having already been decided favorably to the defendant in the first trial, the Court said, it cannot be litigated again, applying the principle of collateral estoppel which, the Court held, is embodied in the Fifth Amendment guarantee against double jeopardy.

Three of the Justices, in a concurring opinion, urged the same transaction test as an alternate ground for reversing Ashe's

---

6. The Court in *Ahuna* describes the "same evidence" test thusly:

    "The same evidence test looks to statutory definitions of offenses. As good a definition as any of this test is found in Morgan v. Devine, 237 U.S. 632, 641, 35 S. Ct. 712, 715, 59 L.Ed. 1153 (1915), where

it is stated that 'the test of identity of offenses is whether the same evidence is required to sustain them; if not, then the fact that both charges relate to and grow out of one transaction does not make a single offense where two are defined by the statutes.'" 52 Haw. at 323, 474 P.2d at 706.

conviction. The double jeopardy clause, they said,

> "requires the prosecution, except in the most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode or transaction." 397 U.S. at 453, 454, 90 S.Ct. at 1199, 25 L.Ed.2d at 481.

It will be noted that although the majority of the Court held the principle of collateral estoppel to be of federal constitutional dimension as an ingredient of the Fifth Amendment guarantee against double jeopardy, the Court stopped short of adopting the same transaction principle.

■ None of the numerous cases called to our attention by Defendant or found from our own research involve the application of the same transaction test to the reprosecution for an offense of which the defendant has been found guilty after that conviction has been reversed on his motion because of error, the *Ball* type situation. The Defendant's argument here not only urges the abandonment of our traditional standard of double jeopardy but also contemplates the extension of the use of the same transaction test much farther than the scope of any judicial precedent. In effect, it would limit the state to a single opportunity to give a defendant an error-free trial. We are convinced that this would be an entirely unjustified emphasis of the "sporting chance" concept and an abandonment of the societal interest in the fair final determination of guilt or innocence of persons charged with crime.

*The Defendant's Claim of Violation of Due Process*

Before Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the United States Supreme Court examined state efforts to retry or reprosecute defendants only in the light of Fourteenth Amendment requirements of fundamental fairness and due process of law. In *Benton* (which finally made federal double jeopardy standards applicable to the states), Justice Marshall noted that the Court in Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937) had decided that only the Fourteenth Amendment applied to state double jeopardy cases and then "[o]nly when a kind of jeopardy subjected a defendant to 'a hardship so acute and shocking that our policy will not endure it.'" 395 U.S. at 793, 89 S.Ct. at 2062, 23 L.Ed.2d at 715.

■ Thus, it is manifest—and nothing to the contrary has ever been so much as intimated by the Supreme Court—that no denial of federal due process occurs per se when one who has appealed from a conviction of crime in a state court and has had the conviction set aside is retried for the same offense.[7]

■ While we hold in this case to the traditional concept of double jeopardy, we fully agree that circumstances may exist in a given case under which repeated reprosecutions or successive prosecutions would amount to fundamental unfairness and a denial of due process. It seems clear to us, however, that the State's conduct here does not offend either federal or state due process standards or demand the application of collateral estoppel.

Nowhere in this case is there any appearance of prosecutorial or judicial overreaching or of harassment of the Defendant. The fact that the jury failed to find that Mildred Eddy's death resulted from any act of the Defendant is not evidence that the prosecution was unjustified. At the time of Defendant's trial the question whether assault with intent to kill should be treated as a lesser offense necessarily included in the crime of felonious homicide had not been determined definitively by this Court. The experienced trial Justice

---

7. Support for this principle would appear to be implicit in Murphy v. Massachusetts, 177 U.S. 155, 20 S.Ct. 639, 44 L.Ed. 711 (1900) in which the Court stated, by way of dictum, that "a convicted person cannot by his own act avoid the jeopardy in which he stands, and then assert it as a bar to subsequent jeopardy." 177 U.S. at 158, 20 S.Ct. at 640, 44 L.Ed. at 713.

was satisfied that it must be so treated and Defendant's trial counsel permitted the verdict to stand unchallenged and, in fact, participated in the Defendant's entering a plea of nolo contendere to assault with intent to kill in the case of the other indictment which charged felonious homicide in Mr. Choate's death. It was not until Defendant's present counsel presented us with his petition for the writ of habeas corpus that the Bench and Bar of the State had the benefit of this Court's analysis of the relationship between the two statutory offenses. All parties concerned apparently were satisfied that the Defendant was being tried for assault with intent to kill as a lesser included offense. The Defendant is not required to completely "run the gauntlet" of prosecution again—the jury's unauthorized verdict of guilty of assault with intent to kill did have the effect of freeing him from any danger of reprosecution for Mildred Eddy's *death*.

In short, there are present here none of the circumstances which appear to have convinced other courts that the traditional *double jeopardy test was inadequate to avoid unfairness.*

### Denial of Right to a Speedy Trial

Mildred Eddy died on July 30, 1969. Defendant was originally indicted for felonious homicide in the penalty degree of murder 14½ months later, on October 12, 1970. Two months later, Defendant's attorney moved for continuance of trial and the motion was granted. One month later—three months after the return of the indictment—trial began, and was concluded within one week. Pursuant to his conviction Defendant was sentenced on February 8, 1971 to not less than 4½ and not more than 10 years. He had served almost two years of that sentence when this Court on November 22, 1972 sustained his petition for habeas corpus and ordered him enlarged. 5½ months after his release, on May 9, 1973, the new indictment was re-

turned charging him with assault with intent to kill. Defendant, a month later, moved to dismiss, and a week and a half later, hearing was had and that motion was denied. On August 21, 1973—three months after the return of the indictment and two months after the denial of the motion to dismiss the indictment—it was ordered that the Defendant's interlocutory appeal from this denial be reported to this Court.

Defendant claims that these proceedings deny him his right to a speedy trial, a right guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, § 6, Constitution of Maine.[8] We disagree.

In arguing denial of his Sixth Amendment right, Defendant alleges unnecessary delay in both the proceedings as a whole—and in different phases. Delay at different stages in a criminal proceeding brings into play different tests in determining whether a defendant has been denied constitutional rights. We will therefore identify and discuss separately the different instances of delay alleged by Defendant. The three years, nine months and nine days "delay" between the death of Mildred Eddy and the return of the present indictment can be roughly divided into four periods as follows:

14½ months: death of Mildred Eddy (7/30/69) to return of murder indictment (10/12/70)

3 months: return of murder indictment to commencement of trial (1/15/71)

22 months: sentencing pursuant to conviction of assault with intent to kill (2/8/71) to granting of petition of habeas corpus and order for release (11/24/72)

5½ months: release from prison to return of assault indictment (5/9/73)

_____

3 years and 9 months

8. As with the double jeopardy provision of the Fifth Amendment, the Sixth Amendment requirement of speedy trial is now applied to the states. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

■ We observe, first, that the right to a speedy trial does *not* arise until criminal prosecution has begun and a defendant has become an "accused". Pre-indictment delay does not deny a defendant's Sixth Amendment right. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); State v. O'Clair, Me., 292 A.2d 186 (1972); State v. Harriman, Me., 259 A.2d 752, 755 (1969); *see* State v. Boynton, 143 Me. 313, 323, 62 A.2d 182 (1948). As expressed in United States v. Marion, supra,

> "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." 404 U.S. at 320, 92 S.Ct. at 463, 30 L.Ed.2d at 479.

After the death of Mildred Eddy and until the return of the murder indictment—the 14½ month period—Defendant was, in no way, an "accused". No criminal prosecution had been initiated.

■ The return of the indictment triggered the operation of the Sixth Amendment but only three months passed between the return of the indictment and the start of the trial and the record shows no demand by Defendant for an earlier trial. In fact, it appears from the record that one month of that time resulted from Defendant's own motion for continuance and cannot be charged against the State. State v. O'Clair, supra. Certainly, the Defendant originally received a speedy trial.

During the 22 months which the Defendant spent in prison, no charges were pending against him. While the passage of time in any period carries the possibility of impairment of a defendant's ability to defend himself, not every delay-caused detriment should abort a criminal prosecution, as the Court recognized in *Marion*. The legislatures have provided statutes of limitations which are their assessment of the periods of time which may fairly elapse between the crime and the bringing of the charge.

In United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966) defendants, having served more than a year of their sentences, obtained reversals of their convictions on the basis of insufficient indictments. Both were rearrested and reindicted two months later. The new indictments were challenged on both double jeopardy and speedy trial grounds but the Supreme Court found neither required dismissal. In examining the speedy trial claim, the Court looked at the purposes of the constitutional guarantee of a speedy trial and concluded that it was designed to prevent purposeful and oppressive delay (Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 485, 1 L.Ed.2d 393, 399 (1957) ) and to promote "expedition and not mere speed" (Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041, 1048 (1959) ). The Court reiterated the policies previously stated by Justice Harlan in *Tateo,* which underlie the rule permitting retrial when the defendant has obtained a reversal of his conviction. The Court felt that these policies would be seriously endangered if it were to be held, under such circumstances, that "the substantial interval between the original and subsequent indictments" had in itself violated the speedy trial provision. 383 U.S. at 121, 86 S.Ct. at 777, 15 L.Ed.2d at 631. The *Ewell* Court commented in a footnote on the same page that, although the defendant in *Tateo* had served almost seven years of his sentence before obtaining reversal, no suggestion was made by the remanding Court that he had been denied a speedy trial.

■ We consider that the period which the Defendant spent in prison is in the same category as the period between Mildred Eddy's death and the bringing of the first indictment. No charge was *pending* against him upon which he was entitled

to a speedy trial. "Delay" under these circumstances was measured only in terms of the statute of limitations.

■ We believe that the same is true of the period of 5½ months between the Defendant's release from prison and the bringing of the present indictment. The right to speedy trial, as the *Marion* Court points out (adopting the language of a writer in the Columbia Law Review), does not arise until there is a charge or arrest, "even though the prosecuting authorities had knowledge of the offense long before this." United States v. Marion, supra, 404 U.S. at 319, 92 S.Ct. at 462, 30 L.Ed.2d at 478. In *Boynton,* the defendant complained of the lapse of time between his invalid (and later quashed) conviction by a Trial Justice Court lacking jurisdiction and his subsequent indictment by a grand jury. In *Harriman,* several months had elapsed between a dismissal (without prejudice) in the District Court and an indictment for the same offense in the Superior Court. We held, in each case, that the right to speedy trial was not applicable to these periods when the defendants stood uncharged saying:

> "The only bar because of lapse of time, to the institution of proceedings . . . is the statute of limitations." State v. Boynton, supra, 143 Me. at 322, 62 A.2d at 188; State v Harriman, supra 259 A.2d at 755.

■ As we observed in State v. Carlson, Me., 308 A.2d 294, 298 (1973), the mere lapse of time will not per se establish a denial of speedy trial.[9] The total elapsed time between the death of Mildred Eddy and the bringing of the present indictment is well within the Statute of Limitations. Even if we were to consider that the defendant suffered some of the disabilities of an accused person during the 5½ months

between his release from prison and his present indictment, we would not be able to say that this was, per se, a fatal delay in view of our recognition of the fact that

> "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 577, 49 L.Ed. 950 (1905).

The only "circumstance" directly brought to our attention here is the State's acknowledgement that one Grand Jury session had taken place in Kennebec County during this interval, and this would not constitute unconstitutional delay, per se, either alone or in conjunction with the preceding events.

We acknowledged in *Boynton* that

> "Conceivably, successive prosecutions each long delayed over the protests or demand for trial by the accused and then abandoned without reason, and a new one instituted might be so oppressive and prejudicial to the rights of a respondent that such conduct, as a whole, on the part of prosecuting officers would violate his constitutional right to a speedy trial even on a new prosecution. 143 Me. at 323, 62 A.2d at 188.

No such circumstances are disclosed by the record here. The record shows us no delay which is either purposeful or oppressive. The Defendant asserted no right and proved no prejudice. We find no denial of right to speedy trial.

The entry must be:

Appeal denied.

Case ordered remanded to the Superior Court for trial.

All Justices concurring.

9. We noted in *Carlson* that the United States Supreme Court has identified four factors to be considered in reaching decision on speedy trial issues: "[l]ength of delay, the reason for the delay, the defendant's asser- tion of his right and prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972).