STATE of Maine

v.

James HICKS.

Supreme Judicial Court of Maine.

Argued Jan. 7, 1985.

Decided July 9, 1985.

James E. Tierney, Atty. Gen., Charles K. Leadbetter (orally), Fernand R. LaRochelle, Anita M. St. Onge, Rae Ann French, Asst. Attys. Gen., Augusta, for the state.

Stern, Goldsmith & Billings by J. Hilary Billings (orally), Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

There was no evidence whatsoever of a victim's body, of a weapon or of bloodstains in this criminal homicide case. Nevertheless, upon evidence wholly circumstantial the Defendant, James Hicks, was convicted by a Penobscot County jury of criminal homicide in the fourth degree, 17–A M.R.S.A. § 204 (Pamph.1976).

In appealing from his conviction, the Defendant challenges the sufficiency of the evidence to support his conviction. Furthermore, he argues that the Superior Court erred in: (1) refusing to instruct the jury on criminal homicide in the fifth degree; (2) entering a judgment of conviction for criminal homicide in the fourth degree when it was barred by the statute of limitations; (3) admitting into evidence certain statements of the Defendant prior to independent proof of the corpus delicti; and (4) admitting into evidence testimony regarding the alleged victim's character as a loving mother.

We disagree and affirm his conviction.

On October 4, 1983, the Defendant was indicted by a Penobscot County grand jury for intentionally or knowingly causing the death of his wife, Jennie Hicks, on or about July 19, 1977. 17–A M.R.S.A. § 202(1)(A) (1975, c. 740, § 40)(repealed 1977). Although the unusual circumstances surrounding Jennie Hicks' disappearance ultimately led to a trial commencing on March

12, 1984 in which no evidence of a body, murder weapon or bloodstains were offered, the jury was warranted, nevertheless, in finding the following facts.

In July, 1977, the Defendant, his wife, and their two children, Veronica, age six and Sean, age two, were living in a trailer park in Carmel. Jennie was known to be a loving, responsible mother. She was employed by the Penobscot Nursing Home in Brewer as a kitchen worker and had begun studying for certification as a nurses' aide. Jennie was described by her employer as a reliable and motivated worker and one who appeared enthusiastic about the prospects of furthering her education. The Defendant worked as a laborer for a construction company, in Woodland.

In order for Jennie to continue working, she asked Susan Mately, a fifteen-year-old girl from Massachusetts, to move in with them and care for the children. Susan accepted the offer and became the Hickses' live-in babysitter in June, 1977. The arrangement seemed to suit everyone involved until the Defendant made sexual advances towards Susan on July 17, 1977. Susan told Jennie about the incident the following day.

On July 18, Jennie, along with Veronica, Sean, and Susan, went to visit Jennie's sister, Denise Clark. Veronica asked if she could stay with her aunt during Ms. Clark's vacation. Jennie and Ms. Clark agreed that it would be fine if Veronica spent that night. Jennie indicated that she would bring some of Veronica's clothes to her the next day. Jennie also told her sister that she would drive her to the dentist's when she arrived with Veronica's belongings. Before leaving her sister's, Jennie declared her dissatisfaction with the Defendant. She told her sister that the Defendant would be moving out the next weekend and that if for some reason he did not leave, she would move out. She declared that she would never leave the children with him.

On the same day Jennie agreed to bake a cake for Linda Elston, a close friend, and to deliver it the next day. Sometime after making the above-described commitments, Jennie, the Defendant, Sean, and Susan had dinner together in the Hickses' trailer. During dinner the Defendant apparently sensed that Jennie was upset over something, but he was uncertain whether Susan had mentioned anything to Jennie about his sexual advances. He questioned Jennie and she responded that they would discuss things later. The Defendant moved to kiss his wife, but she would not let him. Showing displeasure with Jennie's reaction, he threw his dishes into the sink. Susan left to go on a date for the evening and did not return until 4:00 A.M.

During the early morning hours of July 19 a neighbor of the Hickses' heard Jennie Hicks screaming, a man swearing, and a small child crying. This neighbor specifically recalled that Jennie screamed, "[O]h, stop, Jimmy, please stop" or "Stop, you're killing me." The Hickses' trailer then became quiet and she noted that there was a light on inside. Soon thereafter the neighbor heard noises that resembled the sound of wood being chopped or sawed.

When Susan Mately returned to the Hicks trailer at 4:00 A.M. she perceived that something was wrong. As she entered the living room, she found the Defendant sitting in a chair watching television and Jennie lying on a love seat with her head down on its wooden arm. Jennie's hair covered her face and Susan noted that her body was in an awkward position for sleeping. The Defendant told Susan that Jennie was asleep, but Susan feared that Jennie was not well. Susan remembered seeing Jennie wearing a blue fuzzy bathrobe at that time. After Susan went to her room and got into bed she heard slippers scuffing across the floor and then heard the trailer door open. Susan was afraid to investigate what she had heard. She hid her head under the covers and eventually fell asleep.

In contrast to the above scenario, the Defendant maintained at trial that he and his wife had gone for a drive on the evening of July 18 to talk things over and that

they went back to their trailer to continue the conversation. According to the Defendant, the outcome was that he would move out the next weekend. He further testified that Susan returned at approximately 11:00 P.M. that night. The Defendant recalled that Jennie had even spoken to Susan. He added that he and Jennie took Sean to bed with them, and when he got ready for work the next morning at 4:30 A.M. Sean and Jennie were still in bed. The Defendant's supervisor, who lived in the same trailer park as the Defendant and had occasionally travelled to work with him, testified that leaving for the Woodland site at 5:30 A.M. allowed ample time to stop for coffee and be at work by 7:30 A.M.

On July 19, sometime before 6:00 A.M., the Defendant called Linda Elston and asked if Jennie was with her. Mrs. Elston had not seen Jennie that morning. He mentioned that he had attempted to reach Jennie at the trailer, but there was no answer and he needed to tell her where to find the keys to the truck. Susan testified that she never heard the phone ring and awoke only when she heard Sean crying in the doorway of his parents' room. Susan continued testifying that she looked in the trailer for Jennie, but Jennie was gone, her glasses and purse were on the kitchen table, and the truck was parked in the driveway. The Defendant normally drove the truck to work rather than the Hickses' car. Susan knew that it was odd for Jennie to have gone somewhere without her glasses. Jennie's vision was extremely poor, causing objects to become progressively blurred beyond a distance of ten inches when she did not wear her glasses. Susan testified that she found Jennie's second pair of glasses in a dresser drawer and determined that none of Jennie's clothing, except the blue fuzzy robe Jennie had been wearing when she was seen lying on the love seat, appeared to be missing.

The Defendant returned from work sometime between 3:30 and 4:00 P.M. He asked Susan where Jennie was to which Susan replied that she had not seen Jennie all day. Susan told him that Jennie had left without her glasses, but he expressed no great concern and stated that Jennie only needed her glasses for reading and driving. The Defendant then left the trailer for about one or one and one-half hours and returned home to tell Susan that she and Sean were going to his mother's house. Apparently, he had previously stopped at Jennie's parents' house to ask if they had seen Jennie. He explained to them that she had left without taking the kids or her glasses. They too had not heard from their daughter. Upon arriving at his mother's house, the Defendant left Susan and Sean and went somewhere with his brother George for about two hours. When the Defendant, Susan, and Sean went back to the Hickses' trailer later that evening Susan noted that a light had been turned on and Jennie's glasses had been taken. The Defendant commented that Jennie must have been at the trailer while they were gone and left with her glasses.

Approximately four days after Jennie's disappearance, Jennie's father noticed the Defendant scratching his arms. The Defendant claimed he had contracted poison ivy at work. According to the Defendant's supervisor at the Woodland site, it was highly unlikely anyone could come into contact with poison ivy on that job.

Approximately one week after Jennie Hicks' disappearance, Linda Dunnifer, who had known Jennie for a couple of months, received a telephone call from a woman who identified herself as Jennie. The caller asked Ms. Dunnifer to convey a message to the Defendant that he was to bring her clothes and that he knew where to find her. The caller refused to divulge her whereabouts and simply repeated the same message. Ms. Dunnifer believed that the woman became irritated and could not end the conversation fast enough. Ms. Dunnifer never gave the message to the Defendant, but instead described the strange call to Linda Elston. Similarly, Mrs. Elston never mentioned the call to the Defendant. The Defendant, however, sometime thereafter

went to see Linda Elston and asked her about a call that Jennie had made to her requesting that she get a message to him about some clothes. The Defendant made the same inquiry of Wayne Elston, sometime in 1983, and further asked whether he knew anything about the State Police investigation into Jennie's disappearance.

A couple of months after Jennie was last seen, the Defendant, his brother George, and Wayne Elston were riding in a vehicle in Bangor when suddenly the Defendant, who was driving, began to pursue a car that had passed them traveling in the opposite direction. According to Elston, the Defendant had exclaimed that he had seen Jennie in the other car. The Defendant recalled that it was either his brother or Elston who had seen Jennie.

On different occasions, the Defendant represented to others that Jennie had cashed checks after July 19, 1977, that she had been sending Christmas presents to the children regularly, and that she was even providing child support. Bank records revealed that Jennie had not cashed any checks after July 19. She also never picked up her last paycheck from the nursing home. The Defendant's mother recalled that the Defendant had told her that it was Jennie's handwriting on two Christmas presents that were anonymously delivered in 1977. At trial, he denied ever making such a representation to his mother.

A number of times the Defendant told Jennie's family and friends that he had seen and talked with Jennie in Newport. He described that she was in a car that had pulled up behind his truck and flashed its lights. According to the Defendant, he walked back to the car and talked to Jennie who said that she was fine and staying with the man seated in the car with her. She allegedly told the Defendant that she would be traveling to Florida soon and that she had wondered how the children were.

According to Jennie's mother, Myra Cyr, sometime between October, 1978 and February, 1979, she spoke with the Defendant and asked whether he had heard from Jennie. The Defendant told her that she was living in Florida. Mrs. Cyr said he was lying and he responded that Jennie was really living in New Hampshire. Mrs. Cyr further challenged the Defendant and said, "I think you killed her and hid the body," to which the Defendant said, "you'll never prove that."

At the close of all the evidence the jury was instructed on both criminal homicide in the second degree and criminal homicide in the fourth degree. 17–A M.R.S.A. § 202 (1975, c. 740, § 40) (repealed 1977); 17–A M.R.S.A. § 204 (Pamph.1976)(repealed 1977). Obviously rejecting the Defendant's testimony regarding the events occurring at the time of Jennie Hicks' disappearance, the jury found him guilty of fourth degree homicide.

 The first issue we address is whether there was sufficient evidence to prove beyond a reasonable doubt that the Defendant committed criminal homicide in the fourth degree by recklessly causing Jennie Hicks' death on or about July 19, 1977.[1] In many homicide cases death is routinely proven by the testimony of a medical examiner who has examined the victim's body. This case presents no direct evidence of death, but, as we have noted in the past, a conviction based on circumstantial evidence is not for that reason alone any less conclusive than one based on direct evidence. *State v. Snow,* 464 A.2d 958, 961 (Me.1983); *State v. Gagnon,* 383 A.2d 25, 31 (Me.1978). The Defendant concedes that the fact that Jennie Hicks' body was never recovered does not, in and of itself, preclude a conviction of homicide. *See, e.g., Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882, 891 (1982); *People v. Manson,* 71 Cal.App.3d 1, 42, 139 Cal.

---

1. 17–A M.R.S.A. § 204 (Pamph.1976) (repealed 1977) provided in pertinent part:
 1. A person is guilty of criminal homicide in the 4th degree if he:

A. Recklessly causes the death of another human being.

Rptr. 275, 298 (1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); *State v. Pyle,* 216 Kan. 423, 532 P.2d 1309, 1317 (1975); *Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552, 558 (1963).

■ It was the jury's task to resolve inconsistencies and conflicts in the witnesses' testimony and it is our role as an appellate court not to act as a fact finder in the first instance, but rather to determine whether the jury's finding was rational. *State v. Clark,* 386 A.2d 317, 323 (Me. 1978). Notwithstanding the Defendant's claim that his wife abandoned him on July 19, 1977, we find that the evidence, including testimony concerning: (1) the specific commitments that Jennie Hicks had made to her family and friends for July 19, 1977; (2) Jennie's character as a loving mother and responsible employee; and (3) Jennie's absence for over six years without the slightest contact with family or friends, supports a finding beyond a reasonable doubt that Jennie Hicks died at the time of her disappearance.

Similarly, we identify adequate support for the jury's finding that the Defendant's reckless conduct caused his wife's death. "Recklessly" was defined as follows:

A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.

17–A M.R.S.A. § 10(3)(A) (Pamph.1976) (repealed 1981).

■ The Defendant argues that his conviction was based on mere guess or surmise rather than on proven facts. A surmise, as defined by this Court, is evident when the jury is confronted with two or more equally probable theories and one is selected to the exclusion of the other. *Hersum v. Kennebec Water District,* 117 A.2d 334, 338 (Me.1955). In this case, however, there were no *equally probable* theories available to the jury. Given both the neighbor's and the babysitter's testimony, a logical inference would be that the Defendant inflicted grave injury upon Jennie

Hicks during the early morning hours of July 19. Jennie Hicks' scream that the Defendant was killing her and the frightening scene that the babysitter faced when she returned to the Hickses' trailer would, in combination, support inferences that the Defendant was put on notice of the harm he was causing; that he consciously disregarded the inherent risk that his conduct would cause her death; and that he placed his wife's body on the love seat, covering her face with her hair to hide any signs of death. The jury was further entitled to infer that the babysitter's recollection of the sounds of slippers scuffing and the trailer door opening were evidence that the Defendant dragged his wife's body to the door and then placed it in the trunk of his car, where it remained until he discreetly disposed of it somewhere in the many miles he travelled to work. The body could perhaps have been more readily concealed in the family car than in the truck. The jury may have found that in his rush to accomplish these ends, the Defendant inadvertently left Jennie's glasses and purse behind in plain view.

Additional evidence of the Defendant's inconsistent statements made to Jennie's friends and family describing both her whereabouts and his contact with her could likewise have reasonably created an inference that the Defendant was following a scheme to allay suspicions. The jury also may have inferred that the telephone call to one of Jennie's friends was staged by the Defendant and mistakenly made to Linda Dunnifer instead of Linda Elston. In sum, considering the evidence in a light most favorable to the State, the fact finders could have rationally found beyond a reasonable doubt that the Defendant's conscious disregard of a substantial and unjustifiable risk caused Jennie Hick's death.

Turning to the Defendant's contention that the Superior Court erred in refusing to instruct the jury on criminal homicide in the fifth degree, we reach only the question of whether, under the since repealed statutes, criminal homicide in the fifth de-

gree, "criminally negligent homicide," is a lesser included offense of criminal homicide in the second degree, "intentional or knowing homicide." 17–A M.R.S.A. § 205 (Pamph.1976) (repealed 1977);[2] 17–A M.R.S.A. § 202(1)(A) (1975, c. 740, § 40) (repealed 1977).[3] In *State v. Leeman,* 291 A.2d 709, 711 (Me.1972), we observed that a lesser included offense is one that is necessarily included in the greater. Under the *Leeman* definition, a person could not commit the greater offense without simultaneously committing the lesser.

■■■ Upon comparing the essential elements of criminal homicide in the second degree with those of criminal homicide in the fifth degree, we immediately note an important distinction. A conviction of second degree homicide specifically requires proof that the accused *intentionally or knowingly* acted, proof of a *subjective* state of mind. Similarly, proof of a subjective state of mind is essential to a conviction of criminal homicide in the fourth degree, "reckless homicide", where it must be shown that the accused *consciously disregarded* a substantial and unjustifiable risk. 17–A M.R.S.A. § 204 (Pamph.1976) (repealed 1977); 17–A M.R.S.A. § 10(3)(A) (Pamph.1976) (repealed 1981). By contrast, a conviction of fifth degree homicide must be based on an *objective* analysis which proves that the accused's conduct constituted criminal negligence in that he *"fail[ed] to be aware* of a substantial and unjustifia-

ble risk." 17–A M.R.S.A. § 10(4)(A) (Pamph.1976) (repealed 1981) (emphasis added).[4]

■■■ The impact that a mens rea element has on a determination of whether one offense is a lesser included offense of another offense was clarified in *State v. Goodall,* 407 A.2d 268, 279–280 (Me.1979). In *Goodall,* we found that inquiries in a prosecution for an offense requiring a subjective state of mind are markedly different from those in a prosecution for an offense requiring an objective view of certain conduct. *Id.; see also State v. Crocker,* 435 A.2d 58, 64–65 (Me.1981). One is not a lesser included offense of the other.[5] These principles lead inexorably to the conclusion that criminal homicide in the fifth degree is not a lesser included offense of criminal homicide in the second degree. Thus, there was no error in the Superior Court's refusal to give the requested instruction.

The Defendant next contends that his conviction of criminal homicide in the fourth degree was barred by the statute of limitations. The provision imposing a statute of limitations in the prosecution of homicide cases is 17–A M.R.S.A. § 8 (1983). Under subsection 1, we first note that a prosecution for second degree homicide, the offense with which the Defendant was charged, may be commenced at any time. *Id.* at § 8(1). A "prosecution for a . . .

---

**2.** Section 205 in pertinent part provided:
1. A person is guilty of criminal homicide in the 5th degree if, with criminal negligence, he causes the death of another.

**3.** *Section 202 in pertinent part provided:*
1. A person is guilty of a criminal homicide in the 2nd degree if:
A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct.

**4.** Section 10(4)(A) provided:
A person acts with criminal negligence with respect to a result of his conduct when he fails to be aware of a substantial and unjustifiable risk that his conduct will cause such a result.

**5.** *Contra People v. Stanfield,* 36 N.Y.2d 467, 369 N.Y.S.2d 118, 121, 330 N.E.2d 75, 77 (1975); *State v. Mattingly,* 23 Or.App. 173, 541 P.2d 1063 (Or.1975). We do not intimate what, if any, changes 17–A M.R.S.A. § 13–A(2)(B)(1983) has made in the law on lesser included offenses. There is no merit in the claim that section 13–A should be applied retrospectively. In the absence of clear, imperative language or necessary implication that the legislature intended section 13–A to be applied to causes of action accruing prior to its effective date of September 14, 1979, the statute is afforded prospective operation only. *See Terry v. St. Regis Paper Co.,* 459 A.2d 1106, 1109–1110 (Me.1983).

Class B ... crime must be commenced within 6 years after it is committed." *Id.* at § 8(2)(A). A conviction of criminal homicide in the fourth degree, a Class B crime, would have automatically been barred by the statute of limitations—the crime was committed on or about July 19, 1977 and the indictment returned on October 4, 1983 —were it not for subsection 7. *Id.* at § 8(7). Subsection 7 provides:

> The defense established by this section shall not bar a conviction of a crime included in the crime charged, notwithstanding that the period of limitation has expired for the included crime, if as to the crime charged the period of limitation has not expired or there is no such period, and there is evidence which would sustain a conviction for the crime charged.

*Id.*

■ We find that, although the jury returned with a verdict of guilty of criminal homicide in the fourth degree, the fact finders could rationally have found beyond a reasonable doubt that the Defendant committed criminal homicide in the second degree. In light of the reasonable inferences that could have been drawn therefrom, the evidence we reviewed earlier would have adequately supported a conviction of "intentional or knowing homicide" under 17-A M.R.S.A. § 202 (1975, c. 740, § 40) (repealed 1977). Accordingly, we reject the Defendant's argument and conclude that his conviction was not barred by the statute of limitations.

■ The Defendant contends that the Superior Court erred in admitting into evidence certain statements of the Defendant prior to independent proof of the corpus delicti. Specifically, the statements involve the Defendant's references to Jennie leaving her glasses behind, seeing Jennie on different occasions after July 19, 1977, and

Jennie having stopped at the trailer to retrieve some of her belongings. The Defendant invokes that aspect of the corpus delicti rule concerning the order of proof at trial; that is the "evidence rule" as opposed to the "substantive rule." *See State v. Rowe,* 479 A.2d 1296, 1299–1300 (Me. 1984). The corpus delicti objection to the order of proof at trial is addressed to the sound discretion of the trial court under M.R.Evid. 611(a). *Id.; State v. Curlew,* 459 A.2d 160, 164 (Me.1983). Here there was no abuse of discretion in the Superior Court's exercise of control over the mode and order of presenting evidence. To have required that the corpus delicti be established prior to testimony on the Defendant's statements undoubtedly would have prompted substantial delay and confusion in the recalling of witnesses. There was no error in the case at bar regarding the order of proof.

■ Finally, the Defendant argues that the Superior Court erred in admitting "evidence of Jennie Hicks' character as a loving mother for the purpose of proving that she acted in conformity therewith on July 19, 1977 in not voluntarily leaving her home." The Defendant did not object at trial to the use of statements regarding Jennie's interaction with her children. Accordingly, our review of the record is now for obvious error impairing the Defendant's substantial rights. *See State v. Stack,* 441 A.2d 673, 679 (Me.1982); M.R. Crim.P. 52(b).

■ The State's burden of proving the unlawful homicide in this case required proof "to foreclose every hypothesis of innocence, including suicide, natural death ... or continuing life *in absentia.*" *Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882, 891 (1982).[6] The State's eliciting of testimony concerning specific in-

---

6. In *Epperly,* the Virginia Supreme Court held, in a first degree murder case in which the victim's body was not discovered, that there was no error in the trial court's admission of evidence concerning the victim's character, traits, habits, and relationships. 294 S.E.2d 882, 891

(Va.1982). As the court found, while the State "may not ordinarily in its case in chief, offer evidence of the good character ... of the deceased ... every fact ... that tends to establish the probability or improbability of a fact in issue, is admissible." *Id.* (citations omitted).

stances of Jennie's behavior around her children, in combination with evidence of her need for her glasses, pocketbook, and clothes, and enthusiasm for her job, was clearly designed to demonstrate the likelihood of Jennie Hicks' departure being anything but voluntary. We find that admission of the evidence in question produced no obvious error affecting the Defendant's right to a fair trial.

The entry is:

Judgment affirmed.

All concurring.